# EXHIBIT B



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EMR/MEF:TBM/RSB
F. #2021R00454

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 26, 2025

**Request to Partially Seal**

<u>By Email and ECF</u>

The Honorable Peggy Kuo
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    <u>United States v. Howard Rubin and Jennifer Powers</u>
                <u>Criminal Docket No. 25-281 (BMC)</u>

Dear Judge Kuo:

       The government respectfully submits this letter to request that a permanent order of detention be entered against the defendant Howard Rubin, because no condition or combination of conditions can reasonably secure Rubin's appearance in court as required or the safety of the community. The government further requests that the defendant Jennifer Powers only be released with a substantial bail package, secured by assets untethered to Rubin, to likewise ensure her appearance in court and the safety of the community.

I.       <u>Factual Background</u>

       Between at least 2009 through 2019, Rubin, Powers and others operated an extensive network whereby they recruited women—often former Playboy models—to fly to New York to engage in sex with Rubin in exchange for money, often relying on force, fraud and coercion. The commercial sex acts involved bondage, discipline, dominance, submission and sadomasochism ("BDSM"). Rubin and Powers spent more than $1 million of Rubin's money funding the operation, and during the same period Powers and her family profited in the millions from Rubin.

       Before 2011, the commercial sex acts primarily took place at luxury hotels in Manhattan. From 2011 to 2017, Rubin leased a two-bedroom penthouse near Central Park (the

"Penthouse") and, with Powers's assistance, transformed a second bedroom into a sex dungeon (the "Dungeon"). The Dungeon was soundproofed; had a lock on the door; and was outfitted with BDSM instruments, devices and furniture, much of which Powers had procured. For example, on July 30, 2012, Powers emailed Rubin with details of how she had furnished the Dungeon, noting, "I've put chains on the four points of your cross and four points of the Dungeon bed. On the end of each chain is a cuff. . . . I've done this bc it will be VERY easy to just throw someone on the cross or on the bed and just strap them into the 'premade' chains and cuffs."[1] Powers maintained the Dungeon, cleaning it between uses, and restocking the equipment.

   Powers was primarily responsible for the logistical aspects of the trafficking network, including recruiting women to have sex with Rubin for money; arranging flights for the women to travel to New York, typically through airports in Queens, New York; securing non-disclosure agreements ("NDAs") from the women; conferring with the Penthouse building doormen to ensure the women could access the Penthouse, and would not overlap with one another; paying the women after the commercial sex acts; and managing fallout with the women after their encounters with Rubin. Powers maintained notes of the women who had engaged in commercial sex with Rubin and whom she paid, and whether Rubin enjoyed the encounters.

   Powers paid the women in amounts dictated by Rubin, using Rubin's money. At times, Powers artificially structured transactions to women, refusing to send a single payment of $10,000 or more, seemingly in an effort to avoid financial scrutiny. Powers also refused to pay women by wire transfer, instead opting for applications like PayPal (notwithstanding the sizable fee associated with those transactions).

   Rubin and Powers kept a stash of blank NDAs in a safe in the Penthouse, which they required women to sign. Women were not provided with a copy of the NDAs before being required to sign. Women were required to attest that they were not under the influence of drugs or alcohol at the time of signing, when at times they had been provided with alcohol and/or drugs by Rubin, Powers or their co-conspirators before being presented the NDA.

   The NDAs purported to require, among other things, that the women assume the risk of the hazards and injury of all BDSM encounters with Rubin, both historic and prospective; prohibited the disclosure of information about the BDSM sex with Rubin; and required the payment of $500,000 to Rubin as a penalty for breach. The NDA represented the sexual activity as "Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person." However, Rubin, Powers and their co-conspirators knew that the NDAs grossly misrepresented the manner and degree of violence the women would endure, which caused women significant pain, left lasting bruising, and on some occasions required medical treatment. In an August 2013 email, Rubin acknowledged that the sexual activity would cause the women "a lot of pain," would make them cry, and would leave them "sore and bruised for probably a week." The abuse Rubin inflicted on victims—many of whom were gagged and restrained in the

---

[1]   All errors and ellipses contained in quotes are original, unless otherwise indicated.

locked Dungeon during the encounters—included electrocuting their genitals; probing their genitals with pool cues and utensils; beating their breasts and bodies with closed fists; and performing violent sex acts on their bodies while they were unconscious.

Although Powers was not present during the commercial sex acts, Rubin kept Powers apprised of who he was seeing and when he was seeing them, and he often provided her with graphic details of the sex acts. For example, in January 2015, Rubin emailed Powers about commercial sex acts with Jane Doe #1 and noted that he used "the cross"—furniture in the Dungeon to which a woman could be restrained. Powers replied, "I can only imagine what you did to her on that cross!!! Did you shock her pussy??" Rubin replied in the affirmative, complained that his electrocution device was losing its strength, and provided other graphic details of the encounter. Rubin boldly and regularly discussed details of his criminal sexual activity from his work email account, while employed at a high-powered financial firm in Manhattan.

The trafficking network at times preyed on women who were desperate, including women who had previously been sexually abused, who were financially desperate, and who suffered from addiction. For example, Rubin probed victims, including Jane Doe #2 and Jane Doe #10, about prior abuse they suffered. Additionally, Rubin learned that Jane Doe #4 had a sick child before he violently brutalized her body. Similarly, Jane Doe #10 suffered from addiction, which Rubin and Powers knew and acknowledged in text messages. In June 2014, before commercial sex with Rubin, Jane Doe #10 told Rubin she was "desperate," was in a "really tough" position, was sleeping on a couch, and needed money "badly." She also indicated that she would take "plenty of Valium" to endure his abuse. Rubin agreed and recruited a co-conspirator ("Co-Conspirator-1") with whom to abuse Jane Doe #10. Rubin described Jane Doe #10 to Co-Conspirator-1 as hating "submissive but she's brokke and says she''ll do anything!" He reiterated, "She hates it, but she's soooo desperate!! We've got to make her cry!!!" Jane Doe #10 told Rubin she was "ready," and Rubin replied, "Ur not, bbut ur desperate and thts good."

Moreover, Rubin, Powers and their co-conspirators relied on women being intoxicated with drugs and/or alcohol before the sexual encounters with Rubin. For example, in September 2011, while at a restaurant before BDSM sexual activity, Rubin told another woman to give Jane Doe #10 drugs to, in sum and substance, take the edge off, and then in June 2014, before another encounter, he told Jane Doe #10 to "Get drunk!" after she had promised to take sufficient Valium to tolerate the activity. In 2015, Rubin provided Jane Doe #2 with a sedative so that he could enact a rape scene, which caused her to go in and out of consciousness while he sexually abused her. And in May 2018, Rubin asked Jane Doe #6 if she did drugs before he abused her, indicating, in sum and substance, that now would be the time if she did. Powers was likewise aware that women often used alcohol and drugs to cope, for example commenting with surprise in an email from January 2015 when she learned that Jane Doe #1 seemed to be able to tolerate Rubin's abuse without being on drugs. Additionally, in September 2016, Powers texted Rubin that over the course of a week, multiple women had vomited from excessive alcohol consumption.

3

The trafficking network relied on a recruitment system in which women were misled regarding the manner and degree of abuse they would endure. As discussed above, the NDAs women were provided grossly misrepresented the manner and degree of abuse Rubin would inflict. Other times, women were recruited on the basis they could use a "safe word" to make the abuse stop, but during their commercial sexual encounter with Rubin, they were either unable to utter the safe word because they were gagged or, when they did say it, Rubin did not respect it. Other times, women simply said "no" or "stop," but Rubin persisted. Still other times, women lost consciousness, but Rubin continued to sexually abuse them.

For example, in 2015, Jane Doe #3 agreed to engage in commercial sex with Rubin on the representation it would be "light fetish play" and that Rubin would not use excessive force. During the first encounter, Rubin complied. Then, however, in December 2015, Rubin bound Jane Doe #3 and beat her repeatedly. She expressed that she wanted him to stop, but he persisted.

Likewise, in September 2015, Rubin inserted a pool cue into Jane Doe #1's vagina at the Penthouse. She told him to stop, but he continued.

Moreover, in September 2016, in anticipation of a BDSM sexual encounter between Rubin, Jane Doe #9 and Jane Doe #4, Rubin told Jane Doe #9, in reference to Jane Doe #4: "I want to hurt her." "I want to abuse her for hrs." "I don't care if she screams [laughing emoji][.]" "This is going to be so fun!" Then, Jane Doe #4 was told that there would be a safe word that she could use to make the conduct stop. However, Jane Doe #4 was tied and gagged, and could not say the safe word. Rubin and Jane Doe #9 violently brutalized her body, punching her breasts and head repeatedly. The abuse did not end until Jane Doe #4 was able to remove enough of the gag to bite Rubin's finger. Then, Rubin texted Powers:

> RUBIN:   It got very rough jenn, we need to be VERY VERY VERY nice….
> RUBIN:   Very important. Trust me.
> RUBIN:   Very important
> POWERS: OK. I am being nice. I just hope you know what you're doing

Similarly, in October 2016, a female co-conspirator ("Co-Conspirator-2") provided Jane Doe #5 with cocaine and then proposed that Jane Doe #5 engage in a threesome with her and Rubin during which Jane Doe #5 would not have to have sex with Rubin. On that basis, Jane Doe #5 agreed. Then, Jane Doe #5 was brought to the Dungeon; locked inside; and physically restrained to the BDSM furniture, while she kicked, fought and screamed to be released. At one point, Co-Conspirator-2 had to sit on Jane Doe #5 to restrain Jane Doe #5. Notwithstanding Jane Doe #5's violent protest, Rubin sexually and physically abused Jane Doe #5.

Additionally, in November 2018, Jane Doe #6 agreed to have commercial sex with Rubin based on his representation it would involve "light bondage" and that she could tell him to stop. Then, Rubin bound Jane Doe #6 to a chair in a hotel room in Las Vegas, Nevada, where he repeatedly beat her body and attempted to penetrate her with a large dildo. When she

4

told him the rope was too tight, he slapped her in the face and told her to "shut up." She told him to stop hitting her breasts, but he persisted. She thought she was going to die. When the encounter was over, Rubin tried to convince Jane Doe #6 that rape was natural, referencing Disney movies like *Beauty and the Beast*.

Moreover, Rubin continued to sexually abuse women even after they lost consciousness, including Jane Does #1, #2 and #7.

Women suffered significant pain, bruising and psychological trauma from Rubin and his co-conspirators' abuse, sometimes causing them to seek medical treatment. On multiple occasions, women confided in Powers regarding what Rubin made them endure, believing that Powers cared about their well-being. In reality, Powers made excuses for Rubin, blamed the women for Rubin's behavior, or provided damage control by encouraging women to tend to their injuries with bruise cream and ice, or in some instances paying off the women in consultation with Rubin. For example, Jane Doe #4's breast implant flipped due to the abuse she suffered, and she sent a video to Powers showing some of the damage. Rubin and Powers agreed to pay Jane Doe #4 tens of thousands of dollars. Jane Doe #3 also confided in Powers regarding how bruised her body was because of Rubin, and Powers told her to buy Arnica cream. Another time, Jane Doe #3 told Powers that Rubin tried to force Jane Doe #3 to perform oral sex on him in a taxi, and in response Powers said, in sum and substance, that Powers had told Jane Doe #3 not to let Rubin get drunk. Likewise, after Jane Doe #6's encounter with Rubin, she developed a seroma on her breast and could not work due to the bruising, which she told Rubin. Similarly, Rubin's abuse caused trauma to Jane Doe #10's buttocks, causing significant pain, for which she sought medical treatment.

To protect the trafficking network, Rubin and Powers also attempted to dissuade women from going to the police or seeking legal resource. For one, the NDAs purported to require women to pay $500,000 to Rubin if they disclosed information about their sexual abuse. Rubin and Powers engaged in more explicit obstruction as well. For example, in connection with a fight between ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮, stemming from Rubin's abuse of ▮▮▮▮▮ Powers instructed ▮▮▮▮▮▮ that Rubin would pay her legal fees, provided ▮▮▮▮▮ lie to the police about who leased the Penthouse, get rid of the drugs in the Penthouse, and keep Powers and Rubin's names out of the lawsuit.[2] ▮▮▮▮▮▮ complied, falsely telling the police that the Penthouse belonged to ▮▮▮▮▮▮ In a text message to Rubin, Powers stated with regard to ▮▮▮▮▮▮ lawyer, "We probably need someone 'good' since the reason they fought was over you…I'm not sure if anything else would be brought up, drugs,

---

[2]   The government respectfully requests leaves to file this letter under partial seal, to protect the identities of the victims referenced herein. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5

sex, etcccc." Powers also sent ▇▇▇▇ an email to share with ▇▇▇▇ lawyer, authorizing the lawyer to share any and all information with Rubin and Powers's own attorney. The email Powers drafted read: "I am writing to express authorization for you to discuss my case with another attorney by the name of ▇▇▇▇. You have my express permission to share any and all information in regards to my case with ▇▇▇▇." Powers was adamant that ▇▇▇▇ send the email.

      Similarly, in October 2016, Rubin suggested that Powers simply offer to pay off ▇▇▇▇ For example, he wrote, "after things cool down next week, I'd like to offer [▇▇▇▇] 1k to drop the charges against [▇▇▇▇]. We don't need r names thrown around." In December 2016, he again suggested to Powers, "I wonder if we cann get hold of [▇▇▇] and just pay herto drop charges. ?"

      Rubin also used more overtly threatening means to dissuade victims from pursuing legal recourse. In approximately November 2017, Rubin and Powers were sued for civil sex trafficking, among other causes of action. See United States v. Howard Rubin et al., No. 17-CV-6404 (BMC) (E.D.N.Y.) (the "Civil Case"). The plaintiffs included Jane Does #1, #4, #8, #9 and #10. Rubin advised Jane Doe #7, whom he saw for commercial sex between approximately 2014 to 2019, that pursuant to his arrangements, a hitman was contacted on the dark web to target women who had filed a civil suit against him, but he did not ultimately retain the hitman. Separately, Rubin advised Jane Doe #2 that he had hired private investigators to investigate women. Numerous women reported that they suspected they were being followed and that their online accounts, including email and social media, had been hacked.

      Additionally, in connection with a different civil case, in a letter from January 2019 from Rubin to Jane Doe #5, sent overnight to her parent's home, Rubin stated, in relevant part:

> I understand that you are considering suing me in connection with our S&M encounter we had together in October 2016. Before you do so, I urge you to think about the following: . . . I will testify publicly that you are a professional prostitute who agreed to have S&M sex with me for $5,000 and that you acknowledged that you understood the hazards of engaging in S&M behavior. . . . I plan to countersue the women currently involved and to seek Court imposed sanctions against the women and their attorneys.

      Rubin and Powers also engaged in financial crimes in connection with their operation of the trafficking network. In a deposition in connection with the Civil Case, Powers testified under penalty of perjury that Rubin paid her a monthly wage of $10,000 from 2011 to 2014, and $15,000 from 2015 to 2017. However, bank records reflect that Rubin in fact sent Powers millions of dollars during that period, far more than she had claimed. Powers layered those transactions through several of her accounts, for no apparent purpose other than to obscure that the source of the funds was Rubin.

Indeed, since approximately 2012, Rubin has funded virtually all aspects of Powers and her family's lifestyle. Among other things, he has paid for the rent on their Manhattan apartment; her children's private school tuition; the downpayment and mortgage on their Texas-based home after the Powers' moved to Texas in 2020; her legal fees in connection with the Civil Case; and since 2018, he has directly paid her credit card bill.

Notably, after the filing of the Civil Case, the structure of Rubin and Powers's financial relationship fundamentally changed, but the substance did not. Instead of wiring Powers money to her bank accounts, Rubin began funding her lifestyle directly, largely by making mortgage payments and paying off her and her husband's credit card bill. Between 2018 to 2023, Powers and her husband charged more than $500,000 per year to their credit card, which Rubin paid. Between at least 2014 to the present, neither Rubin nor Powers have reported any of the money Rubin has provided to Powers and her family on their tax filings with the Internal Revenue Service, which they had an obligation to do.

Moreover, Rubin and Powers have lied to financial institutions to conceal the nature of their relationship. For example, to secure the mortgage on her home in Texas, which Rubin co-signed, Powers falsely told the bank that Rubin was her "uncle." Then, Rubin attested to a financial statement in June 2020, claiming he was not a party to litigation. In fact, he was party to the Civil Case, among others; had been deposed in the Civil Case, as had Powers; and he had sat for the depositions of all plaintiffs that had been deposed. Then, in April 2022, during the middle of the jury trial in the Civil Case, after he had testified, he attested to a second financial statement submitted to the bank, which did not correct his prior material misrepresentation that he was not party to litigation.

## II.    Procedural Background

As noted above, in November 2017, Rubin and Powers were sued in the Civil Case for civil sex trafficking, among other causes of action, in a case that proceeded to trial in March and April 2022. A jury found Rubin liable and Powers not liable. The case is currently pending appeal to the Second Circuit.

On September 17, 2025, a grand jury sitting in the Eastern District of New York returned a ten-count indictment charging Rubin and Powers with sex trafficking, in violation of 18 U.S.C. §1591(a), transporting women in interstate commerce for prostitution, in violation of 18 U.S.C. § 2421(a), and, as to Rubin, bank fraud, in violation of 18 U.S.C. § 1344.

Both defendants face a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of life for sex trafficking; and a maximum sentence of 10 years imprisonment on each count of transporting women in interstate commerce for prostitution. Rubin faces a maximum term of 30 years' imprisonment for bank fraud.

On September 26, 2025, Rubin was arrested at his rental home in Connecticut, and Powers was arrested at her home in Southlake, Texas. Rubin is expected to be arraigned in

this District later this afternoon. Powers will make her initial appearance in the Northern District of Texas, where she will be removed to this District for arraignment at a later date.

III.   Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In evaluating the defendant's dangerousness and risks posed to safety, the Act considers the risk that the defendant will "obstruct justice, or threaten, injure, or intimidate . . . . a prospective witness or juror," or attempt to do the same. 18 U.S.C. § 3142(f)(2)(B). Moreover, as to dangerousness and safety, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

A rebuttable presumption of dangerousness and risk of flight arises when a defendant is charged with a violation of 18 U.S.C. § 1591, as here. 18 U.S.C. § 3142(e)(3)(D). The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3). To rebut this presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this limited burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of evidence that the defendant presents a risk of flight. Id.

To determine whether conditions of release can reasonably assure the defendant's appearance and the safety of the community, the Court must consider: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release. See 18 U.S.C. § 3142(g). If a defendant meets his or her burden of production relating to dangerousness and risk of flight, the presumption in favor of detention does not disappear but remains a factor for the court to consider. Mercedes, 254 F.3d at 436.

In this District, U.S. citizens charged with sex trafficking are often detained pending trial. See, e.g., United States v. Ferron Facey, 24-CR-339 (AMD); United States v. Douglas Welch, 23-CR-411 (MKB); United States v. Michail McKen, 23-CR-377 (JMA); United States v. Timothy Bullen et al., 22-CR-494 (JS); United States v. Napoleon Scott et al., 22-CR-156 (MKB); see also United States v. Jefferson Clay et al., 24-CR-455 (ERK) (interstate prostitution).

8

IV. <u>Rubin Should be Detained Pending Trial & Powers Should be Released Only on a Substantial, Secured Bail Package</u>

Each of the four factors outlined in the Bail Reform Act weighs strongly in favor of Rubin's detention and Powers's release only on a significant, secured bail package that is secured by assets not tied to Rubin. Unless and until she provides such a package, Powers should be detained.

A. <u>The Nature and Circumstances of the Crime Charged</u>

The charged offenses are unquestionably serious and violent, demonstrating the defendants' dangerousness and risk of flight. Indeed, given the nature of the charges, a presumption of detention applies. <u>See</u> 18 U.S.C. § 3142(e)(3)(D).

Rubin and Powers transported women to New York under false pretenses concerning the nature of the sexual activity they would endure, then Rubin brutalized the women in his Dungeon, often with the help of a co-conspirator. Many times, the women were powerless to make the abuse stop—because they said a safe word or told Rubin to stop, which he disregarded; because they were gagged and thus unable to coherently speak; or because they lost consciousness, while Rubin nonetheless continued to sexually and physically abuse them, among other things. Rubin left their bodies bruised and at times deformed. Then, Rubin and Powers used financial and legal coercion to silence the women, threatening legal recourse and public shaming. Rubin even went so far as to pursue hiring a hitman to target women who had sued him.

The crimes were violent, extensive and sustained, together spanning more than a decade. The victims were plentiful. Many were targeted because of their own vulnerability—histories of abuse, desperate financial need and addiction, among other things. Even after Rubin was sued in the Civil Case, he continued his criminal sexual activity, trafficking Jane Doe #6 in 2018, and committing Mann Act violations against Jane Doe #7 through 2019.

All the while, Powers profited financially from Rubin in the tune of millions of dollars, which she accepted for running all aspects of Rubin's sex trafficking network. She engaged in sophisticated techniques to avoid financial scrutiny of her payments to women for their commercial sex work, and for Rubin's payments to her, including layering and artificial structuring. And she lied during her deposition about the amount of money she received from Rubin, misrepresenting the total figure by millions. Indeed, to this day, Rubin and Powers continue to engage in financial crimes—including misleading the bank that issued Powers's mortgage as to the nature of their relationship and Rubin's involvement in litigation, and failing to disclose millions of dollars to the Internal Revenue Service.

      B.      <u>The Weight of the Evidence</u>

The weight of the evidence proving the defendants' guilt is strong, creating a powerful incentive to flee.

As an initial matter, both Rubin and Powers admitted to transporting women interstate for prostitution during their depositions and trial testimony in the Civil Case. <u>See, e.g.</u>, Rubin Trial Testimony at 1435, 1438-39 (indicating he always paid for BDSM sex and noting that "most of the women that I was with were flying in from, you know, somewhere" outside of New York); Powers Deposition at 195 ("I knew that that's what girls were coming for, for sex. And I knew that that was the amount that was agreed upon, was $5,000."). Text messages, emails, financial records, flight records and other evidence confirm as much. Accordingly, there is overwhelming evidence of their guilt on Counts Three through Eight, and Rubin's guilt on Count Nine, charging violations of transporting women interstate for prostitution, each of which carries a maximum sentence of 10 years' imprisonment.

The same is true of the evidence establishing Rubin's guilt of Count Ten, charging bank fraud. In June 2020, he completed and signed a four-page financial statement, in which he claimed he was not a party to litigation, when in fact he was embroiled in the Civil Case, having been deposed, and having sat for numerous other depositions. Indeed, trial in that case was scheduled to begin one month <u>before</u> he signed the financial statement, but was adjourned because of the COVID-19 pandemic. On the basis of that false representation, among other things, Powers and her husband were able to secure a mortgage for their Texas home, which Rubin co-signed. Then, in April 2022, in the middle of the jury trial in the Civil Case, days after Rubin had testified, Rubin again signed a financial statement so that the mortgage could be restructured, but at no time informed the bank he was a party to litigation.

Finally, there is voluminous evidence of Rubin and Powers's guilt on the sex trafficking charges. They secured the victims' consent to engage in sexual activity based on misrepresentations about the manner and degree of the abuse the women would endure. For example, the NDAs that were stashed in the Penthouse, and which women were required to sign, falsely represented that the activity "may on occasion cause injury to my person," when Rubin and Powers knew injury was certain. Powers outfitted the Dungeon—complete with soundproofing and a lock—with furniture to which women could be restrained, and instruments that could hit, probe and electrocute victims. Rubin plotted the pain he would inflict on victims in text messages with co-conspirators, and thereafter recounted the events to Powers. During these encounters, Rubin electrocuted women's genitals; probed their vaginas with pool cues and utensils; senselessly beat their bodies and heads; and continued to sexually abuse them even when they lost consciousness. Then, victims confided in Powers about their injuries and the abuse they endured, sometimes sending videos and photographs. <u>See</u> <u>United States v. Combs</u>, No. 24-CR-542 (AS), 2024 WL 4903741, at *2 (S.D.N.Y. Nov. 27, 2024) (ordering detention based on, <u>inter alia</u>, "compelling evidence of [defendant's] propensity for violence").

The victims' accounts are corroborated by text messages, emails, photographs, videos, financial records, flight records and other evidence. Moreover, the victims' accounts

10

corroborate one another, demonstrating Rubin and Powers's pattern of practice when it came to their trafficking network. And, of course, in the Civil Case, Rubin was found liable for civil sex trafficking involving conduct similar to that here, and one of the same victims (Jane Doe #1). While Powers was found not liable of sex trafficking in the Civil Case, none of Jane Does #2 to #5 were parties to that suit, nor did that suit involve much of the evidence described herein. See United States v. Maxwell, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020) (Nathan, D.J.) (ordering detention based on, inter alia, the strength of the government's case—namely three witnesses' "detailed and corroborating accounts" of the defendant's crimes, and "additional evidence, including flight records").

The weight of the evidence creates a strong incentive to flee, particularly where the defendants are faced with mandatory minimum sentences of 15 years imprisonment and maximum sentences of life imprisonment. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (finding maximum sentence of 15 years "sufficient to provide him with a strong incentive to flee").

C.   History & Characteristics

The defendants' history and characteristics demonstrate that they present a danger to the community and a significant risk of flight.

In addition to Rubin's demonstrated violence, Rubin has extraordinary wealth, some of which is held in accounts overseas. For example, for fiscal year 2024, he maintained approximately $74.4 million in an account in the Cayman Islands. He has ample means to flee, and to assist Powers and her family in doing the same. Moreover, Rubin has limited community or familial ties. He is a divorced, retired financier. Since approximately 2022, he has been living at a rental home in Connecticut alone. He thus lacks ties that would tether him to the United States.[3] See United States v. Sabhnani, 493 F.3d 63, 76-77 (2d Cir. 2007) (finding

---

[3] Courts have recognized that home detention with electronic monitoring is insufficient to ameliorate a significant risk of flight. "[It] does not prevent flight; at best, it limits a fleeing defendant's head start." Maxwell, 510 F. Supp. 3d at 177 (internal quotation marks and citation omitted). There are numerous examples in this District of defendants cutting their ankle monitors and fleeing, many of whom remain at large. United States v. Svetlana Dali, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); United States v. Horst Jicha, 23-CR-342 (OEM) (same the day before a status conference and he remains at large); United States v. Tony Clanton, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); United States v. William Bartell, 22-CR-80 (EK) (same within one week of being released on bail); United States v. Joey Macario, 22-CR-342 (HG) (defendant absconded after removing his

11

defendant's assets, "in the millions of dollars," provided ample means to finance flight for themselves and their family, and that "[a] defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom").

Since 2011, Powers's only apparent employment was as Rubin's personal assistant, managing all aspects of the sex trafficking network described above. To date, she has not reported any wages to the Internal Revenue Service from employment. Her husband is a disc jockey, who reported combined gross income of $40,000 in 2018 and 2019, and no income since then. Their entire lives are funded by Rubin. Although they own a home, it is paid for by Rubin. Rubin also pays for all other aspects of their lives—including travel, grocery bills, even iTunes charges—through their credit card. Given their total reliance on Rubin, and lack of virtually any other means of income, they too present a significant risk of flight, which Rubin has ample means to fund.

Accordingly, as to Rubin, no condition or combination of conditions will secure his appearance at trial or the safety of the community. As to Powers, only a significant bond package, secured by assets that have no connection to Rubin will secure her appearance at trial and the safety of the community. See 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that any surety

---

location monitoring device after being released to attend drug treatment); United States v. Dewayne Tripp, 22-CR-336 (MKB) (defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); United States v. Marius Lacatis, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond, cut his location monitoring device, fled and remains at large); United States v. Marcus Deloatch, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); United States v. Herman Baron, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled one hour before his scheduled change-of-plea hearing and was only re-apprehended five months later); United States v. Michael Artis, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut off his location monitoring device and failed to appear at bail revocation hearing); United States v. Charles May, 19-CR-539 (FB) (defendant charged with several counts of armed robbery absconded while on home detention and remains at large); United States v. Theressa Riddle, 17-CR-491 (JS) (defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); United States v. Sinmyah Amera Ceasar, 17-CR-048, 19-CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and government discovered evidence of violation of her release conditions); United States v. Guanghua Shen, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK airport the day before she was required to self-surrender to the Bureau of Prisons); United States v. Akmal Narzikulov, 13-CR-601 (RJD) (defendant cut his electronic bracelet just days after being released on bail); United States v. Julian Tzolov, 08-CR-370 (JBW) (defendant in a securities fraud scheme attempted to flee to Spain while on location monitoring).

"have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"); 18 U.S.C. §3142(g)(4) (instructing courts to scrutinize source of collateral).

    D.    <u>Nature and Seriousness of Danger</u>

Finally, there is a serious risk that the defendants will "obstruct justice," "threaten, injure, or intimidate" prospective witnesses, and attempt to do the same. 18 U.S.C. §1342(f)(2)(B).

Rubin and Powers's deception, and Rubin's brutality, are at the forefront of this case. They misled victims about what they would endure in the Dungeon, where Rubin senselessly beat victims, including in some instances after they lost consciousness. Then, Rubin and Powers used financial and legal coercion, obstruction and intimidation to protect the trafficking network and themselves. For example, in ▇▇▇▇, Powers instructed ▇▇▇▇ to lie to the police about who owned the Penthouse, to keep her and Rubin's names out of any report, and to get rid of drugs in the Penthouse, in exchange for Rubin funding ▇▇▇▇ legal fees. ▇▇▇▇ complied. Next, Powers attempted to control ▇▇▇▇ legal relationship, directing ▇▇▇▇ to consent to sharing all information about ▇▇▇▇ case with Rubin and Powers's own lawyer. Rubin repeatedly referenced wanting to bribe ▇▇▇▇ to make her drop the charges.



Additionally, Rubin hired private investigators to investigate women. He threatened to publicly shame Jane Doe #5 as a "professional prostitute" when he learned she was pursuing litigation against him. Most alarmingly, Rubin arranged to find a hitman on the dark web to target the victims bringing legal action against him. The foregoing demonstrates not only his willingness to explore violent methods to silence women who would otherwise expose his behavior, but also his ability to further conceal his criminality through means such as access to the dark web.

Accordingly, Rubin cannot be trusted to abide by any conditions of release that the Court sets, particularly in light of his extraordinary wealth, lack of meaningful community ties, and demonstrated history of violence, obstruction and intimidation. <u>See</u> <u>Sabhnani</u>, 493 F.3d at 77 ("[T]he deterrent effect of a bond is necessarily a function of the totality of a defendant's assets."); <u>United States v. Nouri</u>, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (Chin, D.J.) (finding defendant presented "substantial risk of flight" based, in part, on "dishonest and obstructive conduct," including "commit[ing] fraud").

Powers also presents a danger to the victims of the sex trafficking network in light of her complicity and her own obstructive efforts. She facilitated all aspects of Rubin's abuse for almost a decade for her own financial benefit, going so far as to instruct a victim to lie to the police. Rubin continues to finance all aspects of Powers and her family's lives and there is no reason to believe she will cease doing his bidding notwithstanding her own arrest unless there is a very significant package tethering her to the conditions of release. <u>See</u> <u>United States v. Batista</u>, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("In addition to the requirement of financial

13

responsibility, a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial.").

\* \* \* \* \*

In light of the above, the government submits that the Court should enter a permanent order of detention against Rubin, and release Powers only if and when she satisfies appropriate conditions, including:

1) A substantial secured bond of a value constituting a significant portion of Powers's assets, secured by assets that were not funded by or otherwise tied to Rubin, signed by at least two sureties with net worths of sufficient unencumbered value to pay the amount of the bond, with appropriate moral suasion over her, see 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that any surety "have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"), 18 U.S.C. § 3142(g)(4) (authorizing court to conduct an inquiry into the source of property designated as collateral and to decline to accept property "that, because of its source, will not reasonably assure the appearance of the person as required");

2) Home detention with GPS monitoring;

3) Travel restrictions limiting her travel to the Northern District of Texas and, as required for court appearances, New York City, see 18 U.S.C. §3142(c)(1)(B)(iv);

4) A condition forbidding Powers from contact with her co-defendant Rubin, except in the presence of counsel, and from any contact with any co-conspirators, victims or prospective witnesses, see 18 U.S.C. §3142(c)(1)(B)(v); and

5) A condition forbidding Powers from attempting to obstruct the prosecution or retaliate against victims or witnesses, or causing anyone else to do so on her behalf.

Powers should be detained until she furnishes a bail package that satisfies the above conditions.

V.      Conclusion

        For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention against Rubin and release Powers only on a substantial, secured bail package, that is secured by assets with no ties to Rubin. Unless and until she provides such a package, Powers should be detained.

        Respectfully submitted,

        JOSEPH NOCELLA, JR.
        United States Attorney

By:      /s/
        Tara McGrath
        Raffaela Belizaire
        Assistant U.S. Attorneys
        (718) 254-6454/6295